H. R. D. BLANCHET et al. v. JAS. H. MUSSELMAN et al.

Agency — A Claim of Adverse Possession May be Established Through Sales
Made by Agent.

A good title to lands may be established by adverse possession,
through the acts of an agent of a patentee, and although such agent was
appointed to *sell* the lands only, those holding under and by virtue
of leases made by said agent have a right to recognize such agency
and claim the benefit thereof.

Deeds — Particular Wording Construed.

A deed which contains an exception of " all such parts and parcels of
the first described tract of land as are now in the possession of any
person or persons and held under any title or claim of title adverse to
the party hereto of the first part " and " contains after such exceptions
24,000 acres more or less," is held not to embrace any lands claimed by
said conveyance which had been held by any one for the statutory
period of ripening into adverse possession.

APPEAL FROM GRANT CIRCUIT COURT.

May 31, 1867.

OPINION OF THE COURT BY JUDGE WILLIAMS:

The appellant brought this suit October 4, 1858, to recover the
lands claimed by them, the title to which they claimed as being
derived from Young & Phillips, under their patent of January
4, 1786, for 56,000 acres.

The appellees claim to hold by title derived from May, Banister
& Co. under their patent of November 14, 1786, for 40,000
acres.

There are many questions raised as to authentication, evidence,
and alienage, as well as the character of the parties, but we shall
only notice those which we deem important and controlling.

Moses L. Moses, claimed to be the owner of the title to the
lands patented to Young & Phillips, September 2, 1835, con-
veyed the same by deed to L. E. Debories which, however, con-
tains an exception of " *all such parts and parcels of the first
described tract of land as now are in the possession of any person
or persons and held under any title or claim of title adverse to
the party hereto of the first part,*" and also contains a provision

that the said first described tract of land *" contains after such exceptions* 24,000 *acres,* as supposed to be, more or less," it being the intention to convey all of said first described 56,000 acres tract *"as are now in his actual possession."*

And on said September 2, 1835, said L. E. Debories, by agent, conveyed an undivided half of said lands to N. D. Blanchet; this deed refers to the deed of Moses L. Moses to Debories and, in effect, makes the same exceptions and recitals, and also that the conveyance is for an undivided half of 24,000 acres.

As there was known at that time to be an important conflict between the patent boundaries of Young & Phillips and those of May, Banister & Co., it is most apparent that it was not intended by Moses L. Moses to convey any lands then in adverse possession under this patent and within its boundaries, nor was it intended by L. E. Debories to convey any interest in and to such lands to Blanchet.

It, therefore, becomes important at this point to ascertain what lands in this confliction was in the adverse possession of others and what lands under Young & Phillips' patent was then in the actual possession of Moses L. Moses, as this will dispose of many other questions and render their discussion unnecessary.

The territory of this confliction was traversed by Eagle creek, nearly all laying east of the main stream, a small portion being in a bend below where the straight and middle forks emptied into it, and as the two sections of this conflict separated by this stream depend upon somewhat different facts, those applicable to each side thereof will be stated separately.

Jas. O'Hara and Johnson, claiming to have purchased from Prentis & Bouldin the title of the patentees, May, Banister & Co., November 8, 1827, on January 23, 1829, leased to Isaac Ingram for four years *" all that tract or parcel of land embraced within May, Banister & Co.,* 40,000-*acre patent on the east side of Eagle creek,"* excepting such lands as had before been disposed of by their patentees, or their agents, or vendees.

There is some difference between the parties as to the identity of this place, but we think the weight of evidence fixes it as the place originally occupied by Nebb within the interference, and afterward known as Martin Parker place, and which went into the possession of the Simpsons after Parker left it. Isaac Ingram sold this lease to John Ingram, who sold to Parker, and which

was occupied or controlled by John Ingram and his tenants after Isaac Ingram left it until Parker bought it in April, 1836. The boundary of May, Banister & Co. seems to have been well known and recognized by the settlers, both within and without the interference, and when Wilson who owned a tract under the title of Young & Phillips just outside of this interference, in straightening his fences and improvements, embraced some two or three acres within the interference, he recognized it as the land of O'Hara & Johnson.

John Scott had been appointed agent by May, one of the patentees of May, Banister & Co., as early as August 17, 1814, and had sold and leased several tracts of land within this interference, and these were in the actual adverse possession of some of the defendants under said sales and leases when the suit was brought, and by their vendors, either immediate or remote, when the deed of Moses to Debories was made, in 1835; Scott ceased to act as agent just after the purchase of O'Hara & Johnson. Many of these purchases and settlements were east of Eagle creek.

There can, therefore, be no doubt but that the whole of the interference east of Eagle creek at the making of said deed was in the adverse possession as claimed under the patent of May, Banister & Co., either by those who had purchased or leased from Scott, as agent of the patentees, or by O'Hara & Johnson, or their tenants and vendees, for though only appointed to sell and for this purpose only legally so appointed by May, yet Scott did act for all in leasing, etc., and the patentees and their vendees have a right to recognize such agency and to claim the benefit thereof, and are entitled to the possession so gained.

There seems to be but only about 328 acres in this interference west of Eagle creek, and that in the bend of the creek and marked on the division map between Debories and Blanchet as the "Jewett" place, but on Childers' large map as Joseph Jewett's place of 101 acres, Jo Jewett's place of 110 acres, and M. Evans' place of 118 acres; these places were also in adverse possession under May, Banister & Co. patent, not only when suit was brought, but when Moses made the deed of 1835 to Debories.

As, therefore, the whole of this interference was claimed to be held in adverse possession by vendees under the patent of May, Banister & Co., and Moses did not have actual possession of any part thereof when he conveyed to Debories, we are con-

strained to the conclusion that no part of this interference passed by his deed, nor was it intended to be passed, but was embraced by the exceptions.

And the conduct of his vendees rather fortifies than militates against this conclusion.

In the year of 1836, Debories and Blanchet made a mere paper division of their interest, assigning by plat and protraction in lots of different size, not only the land without, but that within this interference, yet neither had to the date of the suit by actual survey, and by metes and bounds, designated the lots within this interference, nor attempted to take actual possession, though a period of twenty-two years had elapsed, save the very small and ineffectual effort by Blanchet, through the agency of Wilson, who had extended his improvements over into the interference and inclosed some two or three acres. This was adjoining his home place which he owned and not adjoining the place which he had under rent from Blanchet. This ostensible possession being connected with his home place, which he owned, it would inure to it, if to any, but this he repudiated, recognizing it as the land of O'Hara & Johnson, and thus he became the tenant at will or at sufferance of O'Hara & Johnson, as to this two or three acres, after thus holding, consistent with O'Hara & Johnson's title, for some two years; Blanchet renewed a lease which he had some two years previously given Wilson for a year, not of his home place, but of a distant one, and in this renewed lease he incorporates terms which might be construed as availing himself of this possession of Wilson, on the interference, and making Wilson his tenant to hold for him the entire interference, and instead of making this an open and notorious holding so as to carry presumed notice to O'Hara & Johnson, he cautioned Wilson that it was not necessary to "make a blowing horn" of the matter. This holding of Wilson only extended to the land actually inclosed and that under O'Hara & Johnson's title, and when he accepted a lease from Blanchet, including this possession, it was not thereby extended so as to embrace other lands, and Blanchet having thus obtained possession of even that small inclosure must be deemed to hold as Wilson held at the will or sufferance of O'Hara & Johnson, and when Chas. O'Hara afterward purchased of Wilson his lands and the possession of this two or three acres within the interference was abandoned and never after resumed

by either Wilson, Blanchet, or any one for the latter, the tenancy was at an end, and O'Hara & Johnson might legally resume possession without notice to either Wilson or Blanchet.

As the view we have taken of the case is fatal to appellants' claim, and as the evidence fully authorized the jury to take this view, their verdict must be sustained and the judgment affirmed, though there may be error as to some collateral questions, which, however, we do not intend to decide for, however this may be, there can be no available error for appellants.

Wherefore, the judgment is affirmed.

*Lindsey & Craddock,* for Appellants.

*Prior, Smith & O'Hara* for Appellees.